UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| CHRISTINE BURKE, | : | Case No. 3:16-cv-485 |
|---|---|---|
| Plaintiff, | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| NANCY A. BERRYHILL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I. Introduction

Plaintiff Christine Burke brings this case challenging the Social Security Administration's denial of her applications for benefits. She applied for Supplemental Security Income on December 16, 2013 and for Disability Insurance Benefits on January 15, 2014, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Gregory G. Kenyon concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), and the administrative record (Doc. #8).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

## II. Background

Plaintiff asserts that she has been under a "disability" since May 1, 2007. She was thirty-four years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education. *See* 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4).[1]

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Kenyon that her ongoing COPD (chronic obstructive pulmonary disease) has gotten worse in the past year. (Doc. #8, *PageID* #561). She is short of breath every day—"more times than [she] can count." *Id*. She uses three different inhalers and between two and ten times a day. *Id*. And, she uses a breathing machine for twenty minutes, four times a day. *Id.* at 573. Cigarette smoke and temperature extremes aggravate her symptoms, causing her to cough and have trouble breathing. *Id.* at 562-63. When she climbs steps to her second-floor apartment, she has to stop after a couple minutes because she has trouble breathing. *Id.* at 564. When she cooks, she has to cook meals that do not require her to stand at the stove for long periods of time. *Id*.

---

[1] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

Plaintiff has diabetes. *Id*. She takes insulin and tests her blood glucose four times a day. *Id*. It ranges from 194 to over 400. *Id.* at 565. When her blood-glucose levels are high, she does not want to eat. *Id*. And, "I get migraines [as] another side effect." *Id*. She has them twice a week and they last from thirty minutes to a couple hours. *Id*.

Plaintiff has been diagnosed with an anxiety disorder, depression, and bipolar disorder. *Id.* at 565-66. She has thoughts of suicide once a week, crying spells once a week, and trouble concentrating and staying focused. *Id.* at 568. She explained, for instance, that she has a hard time focusing on what she has to do with her daughter. *Id.* at 569. Her mom helps her stay focused. *Id*.

She does not like to leave her house and "just the thought of leaving the house freaks [her] out." *Id.* at 567. She has panic attacks every time that she has to go to the store, when her neighbor demands a ride, and sometimes over what to have for dinner. *Id.* at 569. Although she has to leave every day to take her daughter to school and her boyfriend to work and later pick both up, she only goes other places once or twice a month. *Id.* at 568, 573. When she has a panic attack, she feels antsy, is not able to think straight, is short of breath and dizzy. *Id.* at 570. To calm down, she either sits and tries to breathe or talks to her boyfriend about it. *Id*.

She has some irritability and mood swings "all the time." *Id.* at 566. And, "the mood swings come when somebody triggers my anger." *Id*.

Plaintiff usually only sleeps for two hours at a time and then is awake for an hour before going back to sleep for two hours. *Id.* at 570-71. This has been her sleeping pattern for a couple years. *Id.* at 571. She takes naps every day. *Id.* at 574.

Plaintiff estimated that she can lift five pounds at a time, stand for a couple minutes in one spot, and walk not even a quarter of a block before needing to stop. *Id.* at 571. She is able to sit for any period of time. *Id.* at 572. She is able to take care of her personal needs and household chores—but "[i]t takes time." *Id*. For example, when she vacuums, she can only do it for a couple minutes at a time before taking a break. *Id*.

Plaintiff has done some work for the Department of Job and Family Services to maintain her eligibility for benefits. *Id.* at 559. She has, for example, vacuumed in the Emergency Medical Association office and worked with dogs at the animal shelter. *Id.* at 560. She also worked at Neaton Automotive Services for a week opening boxes. *Id*. They fired her because she "was too slow for them." *Id*.

### B. Medical Opinions

#### i. Robert M. Margolis, M.D.

Dr. Margolis, Plaintiff's treating pulmonologist, completed interrogatories in July 2015. *Id.* at 1108-14. He has treated Plaintiff for COPD, asthma, pulmonary nodules, and hemoptysis.[2] *Id.* at 1109. He opined that she could not withstand the pressure of meeting normal standards of work productivity and accuracy without significant risk of decompensation or worsening of her impairments because she "experiences severe dyspnea-on-exertion, [and is] unable to walk and carry boxes …." *Id*. For the same reasons, she could not demonstrate reliability or complete a normal workday or

---

[2] Hemoptysis is "coughing up blood from the respiratory tract." U.S. Nat'l Library of Med., *Coughing up blood,* MEDLINEPLUS, https://medlineplus.gov/ency/article/003073.htm (last updated Apr. 24, 2017).

4

workweek without interruption from symptoms, and she could not perform at a consistent pace without unreasonable numbers and lengths of rest periods. *Id.* at 1110.

Dr. Margolis further opined that, because of Plaintiff's obesity and COPD, she could frequently lift and/or carry five pounds and could not stand or walk at all. *Id.* at 1111. She could frequently balance and could never climb, stoop, crouch, kneel, or crawl. *Id.* Her ability to reach, handle, or push/pull were affected by her impairments; and she was restricted from exposure to moving machinery, chemicals, temperature extremes, dust, fumes, and humidity. *Id.* at 1112. He noted that Plaintiff's asthma would be worsened by exposure to humidity, dust, or fumes. *Id.* at 1113. He estimated Plaintiff would be absent from work three or more days per month because of her impairments and treatment. *Id.* at 1114. Dr. Margolis concluded Plaintiff does not have the residual function ability to do sedentary work on a sustained basis. *Id.* at 1113.

### ii. Carole Foster, N.P., & Gail A. McNerney, LISW-S

Plaintiff's treating mental health providers, Ms. Foster and Ms. McNerney, completed interrogatories and a mental impairment questionnaire in August 2015. *Id.* at 1115-27. They indicated they have treated Plaintiff for depression, anger, bipolar disorder, and post-traumatic stress disorder (PTSD). *Id.* at 1116. They opined that the combined effects of Plaintiff's physical and mental impairments are greater than the sum of her physical or mental impairments taken independently. *Id.* They explained, "Uncontrolled diabetes adds to increased mood lability." *Id.* Further, increased depression leads to apathy, which leads to poor motivation, which leads to a greater lack of diabetic control and care. *Id.* Increased depression and anxiety lead to an increased

5

pain perception, and increased pain leads to increased depression and anxiety. *Id.* at 1117.

Plaintiff's treatment includes medication and psychotherapy, to which she has had a partial response. *Id.* at 1125. Her prognosis is fair but it is an "ongoing struggle to control symptoms." *Id*. Her symptoms include, for example, poor memory; mood disturbances; difficulty thinking or concentrating; oddities of thought, perception, speech, and behavior; and hostility/irritability. *Id.* at 1124.

When asked if she could be prompt and regular in attendance, these providers responded that Plaintiff "[p]eriodically may be able to attend but when [her] mood [is] more unstable, [she] would miss work, most likely too much[,] and be fired." *Id.* at 1117. Because small stressors overwhelm Plaintiff, she could not respond appropriately to supervision, co-workers, and customary work pressures. *Id.* at 1118. And, when she is overwhelmed, she withdraws and her depression increases. *Id.* She could not sustain attention and concentration to meet normal standards of work productivity and accuracy because she "[c]ontinues to struggle with mood instability." *Id*. She cannot maintain concentration and attention for extended periods because she is "[d]isrupted by anxiety, depression, [and] trauma." *Id.* at 1120. Plaintiff cannot get along with co-workers without unduly distracting them or exhibiting behavioral extremes. *Id.* at 1121. They explained, she "[d]oes not take care of her hygiene for long periods of time due to depression. Anxiety caus[es] her to withdraw/isolate." *Id*.

Ms. Foster and Ms. McNerney opined Plaintiff has a slight-to-moderate restriction of activities of daily living; marked difficulties in maintaining social functioning; marked

6

difficulties in maintaining concentration, persistence, or pace; and marked episodes of deterioration or decompensation. *Id.* at 1123, 1126. The indicated that Plaintiff's impairments and treatment would cause her to be absent from work more than three days per month. *Id.* at 1126.

### iii. Leslie Rudy, Ph.D., & Carl Tishler, Ph.D.

Dr. Rudy reviewed Plaintiff's records on February 14, 2014. *Id.* at 608-19. She found Plaintiff has four severe impairments—diabetes mellitus, asthma, affective disorders, and anxiety disorders. *Id.* at 612. She has no restriction in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. *Id.* at 613. Dr. Rudy's mental residual functional capacity (MFRC) assessment "is an adoption of the ALJ['s] MRFC dated 06/17/2013. The MRFC is being adopted under AR [(Acquiescence Ruling)] 98-4 (Drummond Ruling)." *Id.* at 616. This MRFC restricted Plaintiff to "[n]o more than [occasional] interaction with supervisors and coworkers but no more than superficial interaction with public such as sharing common areas and greeting hello. No more than simple, routine, repetitive tasks performed with adequate persistence that only requires regularly scheduled breaks but with a pace and stress tolerance that allows for no production quotas." *Id.* at 616-17.

On May 20, 2014, Dr. Tishler reviewed Plaintiff's records. *Id.* at 621-32. In addition to the same severe impairments identified by Dr. Rudy, he found Plaintiff had one non-severe impairment—dysfunction in her major joints. *Id.* at 626. He otherwise affirmed Dr. Rudy's assessment. *Id.* at 621-32.

7

### iv. Bradley J. Lewis, M.D., & Steve E. McKee, M.D.

On February 26, 2014, Dr. Lewis reviewed Plaintiff's records. *Id.* at 608-19. His residual functional capacity (RFC) assessment "is an adoption of the ALJ RFC dated 06/17/2013. The RFC is being adopted under AR 98-4 (Drummond Ruling)." *Id.* at 616. Specifically, Dr. Lewis found Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently. *Id.* at 614. She could stand and/or walk for six hours and sit for six hours. *Id.* at 614-15. She could frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and she could never climb ladders/ropes/scaffolds. *Id.* at 615. She should avoid even moderate exposure to extreme heat and cold, humidity, fumes, odors, dusts, gases, poor ventilation, etc., and she should avoid all exposure to hazards such as machinery and heights. *Id.* at 615-16.

Dr. McKee reviewed Plaintiff's records on May 20, 2014, and affirmed Dr. Lewis' assessment. *Id.* at 621-32.

## III. Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

IV. **The ALJ's Decision**

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

Step 1:  Plaintiff has not engaged in substantial gainful employment since May 1, 2007.

Step 2:  She has the severe impairments of obesity, asthma, chronic obstructive pulmonary disease, diabetes mellitus, depression, and an anxiety disorder.

Step 3:  She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:  Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "less [than] the full range of light work …. Specifically, [Plaintiff] is subject to the following limitations:  (1) frequent crouching, crawling, kneeling, stooping, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) no operation of automotive equipment; (5) no concentrated exposure to temperature extremes, respiratory irritants, or excess humidity; (6) limited to performing unskilled, simple, repetitive tasks; (6) occasional contact with co-workers and supervisors; (7) no public contact; (8) no fast paced production work or jobs involving strict production quotas[;] and (9) limited to performing jobs in a relatively static work environment in which there is very little if any change in the job duties or the work routine from one day to the next."

Step 4:  She is unable to perform any of her past relevant work.

>           Step 5:    She could perform a significant number of jobs that exist in the
>                      national economy.

(Doc. #8, *PageID* #s 533-44). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 544.

## V. <u>Discussion</u>

Plaintiff contends that the ALJ failed to adequately evaluate the medical source opinions and failed to adequately account for her moderate limitation in concentration, persistence, and pace. The Commissioner maintains that substantial evidence supports both the ALJ's analysis of the medical opinions of record and the hypothetical presented to the vocational expert.

### A. Dr. Margolis' Opinion

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted).

ALJ Kenyon assigned the opinion of Plaintiff's treating pulmonologist, Dr. Margolis, little weight. (Doc. #8, *PageID* #542). His discussion of the treating physician rule is limited to a generic statement indicating he "considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." *Id.* at 539. Without a separate description of the legal criteria actually applied by the ALJ, his decision must be scrutinized to determine whether he "applied the correct

legal criteria" when weighing the treating physician's opinion. *Bowen,* 478 F.3d at 745-46. Doing so reveals that ALJ Kenyon failed to weigh Dr. Margolis' opinion under the correct legal standards—beginning with the treating physician rule.

The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

In the present case, ALJ Kenyon did not address either condition of the treating physician rule. "The failure to provide 'good reasons' for not giving [a treating physician's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) (citing *Wilson,* 378 F.3d at 544). Nevertheless, even if Dr. Margolis' opinion was not entitled to controlling weight, the ALJ must still determine how much weight is appropriate by considering a number of factors …." *Blakley,* 581 F.3d at 406 (citing *Wilson,* 378 F.3d at 544; 20 C.F.R. § 404.1527(d)(2)).

The ALJ gave two reasons for discounting Dr. Margolis' opinion. He found, "[Dr. Margolis] indicated that [Plaintiff] lacks the ability to do even sedentary level work due to COPD. However, the evidence … shows that [Plaintiff] consistently gave poor effort on pulmonary function testing and, on one occasion, the results of her Pulmonary Function Study were interpreted as being normal, despite her having given poor effort." (Doc. #8, *PageID* #541 (citing Ex. B12F, pp. 46, 50 [Doc. #8, *PageID* #s 1190, 1194])). In other words, according to ALJ Kenyon, if Plaintiff's results were normal—even when she gave poor effort—then her COPD must not be severe enough to prevent her from engaging in sedentary work.

Substantial evidence, however, does not support this reason. The ALJ is not a pulmonologist and is not qualified to interpret spirometry results. His conclusion, however, requires an interpretation of such evidence. "[A]n ALJ 'may not substitute his own medical judgment for that of the treating physician where the opinion of the treating

13

physician is supported by the medical evidence.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting, in part, *Meece v. Barnhart,* 192 F. App'x 456, 465 (6th Cir. 2006)); (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")).

The "one occasion" the ALJ refers to occurred on July 29, 2015—the same day Dr. Margolis completed his assessment. Thus, even after having seen the "normal" spirometry results, Dr. Margolis opined Plaintiff was not able to do sedentary work. Further, the ALJ overlooked that Dr. Margolis' indicated in his treatment notes that the spirometry results were *abnormal* and revealed a "mild reduction in flows – best flows of all." (Doc. #8, *PageID* #1169). He noted: "Chronic obstructive lung disease – quite [symptomatic], but flows are only mildly reduced. ? cardiac component ? cardio input[.]" *Id.* Accordingly, the record demonstrates that shortly thereafter, Plaintiff consulted with a cardiologist, James G. Laws, D.O. *Id.* at 1243. Dr. Laws diagnosed six impairments—including shortness of breath. *Id.* He also instructed Plaintiff to undergo a thorough outpatient cardiac evaluation and to take approximately sixteen medications. *Id.*

Although the ALJ is correct that most of the spirometry imaging results indicate "poor effort," Dr. Margolis did not indicate in any of his treatment notes that Plaintiff intentionally or maliciously gave a poor effort. It might well be that Plaintiff's COPD prevented her from giving anything more than a "poor effort." Nor did another doctor suggest that the results of the spirometry tests were inconsistent with Dr. Margolis'

14

opinion. And, the State agency physicians reviewed the record about a year before Plaintiff began treatment with Dr. Margolis. *See id.* at 609-19, 621-33.

The ALJ's summary of the evidence suffers from the same error. He concluded, "Her pulmonary function test results have varied widely, suggesting that she had given poor effort during testing.[3] She notably had one such study in March 2015, which showed that her FEV1 level was just 39% of predicted value and at Listing level (Exh[.] B-6F, [p.] 23, [Doc. #8, *PageID* #942])." *Id.* at 540. Notably, there is no indication in the results or treatment notes that Plaintiff gave poor effort. *See id.* at 942-44. Indeed, Dr. Margolis' impression was "Severe Obstructive Airway Disease (w/acute bronchodilator response)." *Id.* at 1153.

The ALJ also discounted Dr. Margolis' opinion because "the conservative level of treatment [is] not indicative of substantially compromised respiratory functioning." *Id.* at 541. But, he provided no basis or explanation for this conclusion. Thus, it is uncertain what level of treatment would be indicative of substantially compromised respiratory functioning.

In sum, the ALJ failed to provide good reasons supported by substantial evidence for assigning Dr. Margolis' opinion little weight. "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' [the Sixth Circuit] ha[s] held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how

---

[3] To the extent that the ALJ is suggesting that because the results varied, then she must have put forth a poor effort, substantial evidence does not support that conclusion.

15

those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley*, 581 F.3d at 407 (quoting *Rogers,* 486 F.3d at 243).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[4]

**B.     Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

16

Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

## IT IS THEREFORE ORDERED THAT:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Christine Burke was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.

February 20, 2018                      *s/Sharon L. Ovington*
                                                           Sharon L. Ovington
                                                           United States Magistrate Judge